IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

AMANDA M. OLIVEIRA, as
Administrator of the Estate of
MARY FRANCIS CROCKER,

      Plaintiff,

      v.

RHONDA LAWSON; LATONJA WHITE;
CATRICE WINDLEY; CHRISTINA DODD-
BROWNLEY; and AMANDA FRIESE, each
in their Individual Capacities,

      Defendants.

CIVIL ACTION NO.: 4:24-cv-100

**O R D E R**

This case emerges from the tragic deaths of Mary Frances Crocker and her brother Elwyn Crocker, Jr.  Plaintiff Amanda M. Oliveira brings this action as Administrator of the Estate of Mary Frances Crocker.  (Doc. 1-1, p. 1.)  Defendants Rhonda Lawson, Latonja White, Catrice Windley, Christina Dodd-Brownley, and Amanda Friese were each employed by the Georgia Department of Family and Children's Services ("DFCS") during the events in question and are being sued in their individual capacities.  (Id. at pp. 1–2.)  Before the Court is Plaintiff's Motion for Partial Summary Judgment as to Defendants Windley and Lawson.  (Doc. 64.)  Defendants filed a Response and Plaintiff filed a Reply.  (Docs. 72 & 76.)  For the reasons below, the Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion.  (Doc. 64.)

**BACKGROUND**

The Court derives the facts below from the parties' submissions and the summary judgment record.  (Docs. 1, 1-1, 64, 64-1, 64-2, 64-4, 64-8, 64-9, 64-11 & 64-13.)  Under Local Rule 56.1,

a motion for summary judgment must include a separate, short, and concise statement of the material facts as to which it is contended there exists no genuine dispute to be tried as well as any conclusions of law thereof.  All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by a statement served by the opposing party.  S.D. Ga. L.R. 56.1.  Here, Defendants did not include a statement controverting Plaintiff's statement of undisputed material facts, and so those facts are considered undisputed.[1]

On March 16, 2017, Defendant Lawson, an intake case manager for DFCS, received and documented a report of physical abuse of Elwyn Crocker, Jr., ("Jr.") perpetrated by Kim Wright (the "Intake Report").  (Doc. 64-1, pp. 1–2; doc. 1-1, p. 5.)  Lawson concluded that the statements underlying the Intake Report did not constitute an allegation of maltreatment and thus recommended "screening out" the case.  (Doc. 64-1, p. 2; doc. 64-4, p. 3.)  DFCS had a "Second Level Screen-Out Review and Approval Process" in effect at the time, which required that a case manager's "screen out" recommendation obtain documented second-level approval.  (Doc 64-1, p. 2; doc. 64-8, pp. 2, 17.)  Defendant Windley is the only supervisor listed on the relevant documentation as having approved the screen out of the Intake Report.  (Doc 64-1, p. 2; doc. 64-8, pp. 2, 17; doc. 64-2, pp. 9–10.)

DFCS policy also requires that law enforcement or the district attorney be notified of reported abuse and that intake reports be shared with law enforcement.  (Doc. 64-1, pp. 2–3; doc.

---

[1]  Defendants state in their Response that "[Defendant] Windley disputes the alleged undisputed facts," (doc. 72, p. 2), but she did not file a separate statement controverting Plaintiff's Statement of Material Facts, (doc. 64-1), and failed to specify both the particular facts disputed and the bases for those disputations. This is insufficient to establish a genuine dispute as to the facts stated in Plaintiff's Statement of Material Facts.  See Futch v. Chatham Cnty. Det. Ctr., No. CV410-192, 2012 WL 1557336, at *2 (S.D. Ga. May 2, 2012) ("Where the party responding to a summary judgment motion does not directly refute a material fact set forth in the movant's Statement of Material Facts with specific citations to evidence, or otherwise fails to state a valid objection to the material fact pursuant to [Local Rules], such fact is deemed admitted by the respondent." (quoting Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1302 (11th Cir. 2009))).

64-9, p. 1.)  Specifically, then-current DFCS Policy 3.14, entitled "Sharing Intake Reports with

Law Enforcement or District Attorney," imposed the following requirements and procedures:

> **REQUIREMENTS**
> The Division of Family and Children Services (DFCS) shall:
> 1. Notify law enforcement or the district attorney immediately, but no later than the end of shift in which the intake report was received of a report of known or suspected instances [of] child abuse and neglect including reports of physical or mental injury, sexual abuse or exploitation or negligent treatment or maltreatment of a child under circumstances that indicate that the child's health or welfare is threatened.
>
> . . .
>
> **PROCEDURES**
> The CPS Intake Communications Center Social Services Case Manager will:
> 1. Launch the Notification to Law Enforcement Agency Abuse/Neglect Report from Georgia SHINES Intake Action page and submit to law enforcement;
> 2. Share the intake reports with law enforcement via mail; **or**
> 3. Share the intake reports with law enforcement via secure email ensuring the following steps are followed:
>     a. Place the keyword secure in square brackets as such [secure] at the end of the subject line. (Subject: DFCS Intake Reports for July 18, 2013 [secure])
>     b. After sending the email, the recipient will receive a message with an attachment called SecureEnvelope.html: You have received a Secure Web Delivery Message from "sender"@dhs.ga.gov. Subject: This mail is encrypted [secure]. The recipient will click the SecureEnvelope.html attachment to view the message.
> 4. Document on the Georgia SHINES Intake Action page that law enforcement was notified of the intake report.

(Doc. 64-9, p. 1.)

Lon Roberts, testifying on behalf of DFCS, testified that the Intake Report indicates that

law enforcement was notified.  (Doc. 64-12, p. 21.)  The Intake Report lists Effingham County as

the agency notified of the abuse.  (Doc. 64-1, p. 3; doc 64-2, p. 10.)  However, neither the

Effingham County Sheriff's Office ("ECSO") nor DFCS have produced records proving that the

Intake Report was transmitted to ECSO (or any other law enforcement agency).  (Doc. 64-1, p.3.)

Counsel for ECSO stated in an email to Plaintiff's counsel that the office has no record of receiving

a March 16–17 report from DFCS regarding the abuse of Jr. and further noted that, based on the

address on the Intake Report, Rincon would have had jurisdiction over the matter. (Id. at pp. 3–4; doc. 64-14, p. 1.)  Roberts testified that reports are sent to law enforcement via email or fax but that he was unable to locate a copy of any fax or email sent to law enforcement in relation to the Intake Report. (Doc. 64-1, p. 3; doc. 64-13, pp. 21–23.)  A letter from Jennifer Mock, counsel for DFCS, states that while DFCS does not have a copy of any fax or email sent to law enforcement regarding the reported abuse of Jr., "DFCS records indicate law enforcement was notified in March 2017." (Doc. 64-7, p. 10.)  She did not, however, describe the records or provide copies.

According to the Complaint, ECSO discovered in late 2018 that the Crocker children had been subjected to extreme abuse at the hands of their family members and that they had ultimately died from the abuse. (Doc. 1-1, pp. 3–4, 12.)  Plaintiff alleges that, had Defendants not "screened out" the Intake Report, DFCS personnel and/or law enforcement would have visited the Crocker/Wright home prior to Mary's death. (Doc. 64-1, p. 4; doc. 64-11, p. 2.)  Plaintiff now moves for partial summary judgment, arguing that there is no dispute of material fact that Defendants Lawson and Windley violated two DFCS policies—first, by failing to obtain the approval of a second supervisor for the screen out recommendation and, second, by not notifying law enforcement of the report of Jr.'s abuse. (Doc. 64.)

**STANDARD OF REVIEW**

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing there is no genuine dispute as to any material fact. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party has the burden of proof at trial, the moving party may discharge his burden by showing the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). If the moving party discharges this burden, the burden shifts to the nonmovant to present affirmative evidence to show a genuine issue of fact. Anderson, 477 U.S. at 257. When the moving party has the burden of proof at trial, the moving party "must show affirmatively the absence of a genuine issue of material fact," supporting its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial." United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala., 941 F.2d 1428, 1438 (11th Cir. 1991) (internal citations omitted).

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citations omitted). Mere speculation

does not create a genuine issue of material fact.  Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) (internal quotations omitted).

## DISCUSSION

Under the Georgia Constitution, state employees "may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions . . . ."  Gardner v. Bottoms, No. 23-12772, 2025 WL 799282, at *6 (11th Cir. Mar. 13, 2025) (quoting GA. CONST. art. 1, § 2).  "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty."  Common Cause/Ga. v. City of Atlanta, 614 S.E.2d 761, 764 (Ga. 2005) (internal quotations omitted).  Ministerial duties may be established by evidence such as a written policy, an unwritten policy, a statute, or the specific directive of a supervisor.  Roper v. Greenway, 751 S.E.2d 351, 353 (Ga. 2013).  "Where there is an established policy requiring an official to take specified action in a specific situation, the policy creates a ministerial duty on the part of the official to perform the specified task."  Grammens v. Dollar, 697 S.E.2d 775, 777 (Ga. 2010).  Ministerial acts are contrasted with discretionary acts, which involve personal deliberation and judgment.  See Mann, 588 F.3d at 1309.

Plaintiff contends that Defendants violated two DFCS policies which constitute ministerial acts: (1) the requirement to conduct what Plaintiff refers to as "Two Level Supervision Screen Outs" and (2) the requirement to timely notify law enforcement (or the district attorney) of reported child abuse.  (Doc. 64, p. 5.)  Plaintiff argues that partial summary judgment in her favor is appropriate because there is "substantial substantive evidence" and a "complete lack of rebuttal evidence" that Defendants Windley and Lawson breached the DFCS screen out policies and procedures.  (Id. at p. 9.)  The Court addresses each issue in turn.

I.    **Whether Defendants Windley and Lawson Violated Policy 3.18 ("Second Level Screen-Out Review and Approval Process")**

Plaintiff asks the Court to find that the undisputed evidence proves that Lawson and Windley violated Policy No. 3.18 of the Georgia DFCS Child Welfare Policy Manual by not having a "second supervisor" review and document their approval of Lawson's screen out recommendation.  In support, Plaintiff has provided a copy of Policy 3.18 (with an effective date of August 2016), (doc. 64-8, pp. 17–19), and a copy of the at-issue Intake Report, (doc. 64-2).

Policy 3.18 is titled "Second Level Screen-Out Review and Approval Process."  (Doc. 64-8, p. 17.)  The first part of the Policy states that the "CICC Administrator/Designee"[2] will "[r]eview all screen-out . . . Intake Assessment[s]."  (Doc. 64-8, p. 17.)  If the Administrator/Designee agrees with the screen-out recommendation in the Intake Assessment, then they are to: "a. [a]pprove the screen-out . . . Intake Assessment," and "b. [d]ocument *second level approval* on the approval authority page under the Comments section."  (Id. (emphasis added by Court).)  If, however, "*second level approval* is not granted," then the "Administrator/Designee . . . will a. [r]eject  the Intake Assessment, documenting the specific reasons the Intake Assessment recommendation to screen- out . . . was not accepted" and "b. [c]ontact the *CICC Social Services Supervisor* (SSS) to discuss," *inter alia*, "i. [t]he reasons the Intake Assessment was not approved for a screen-out . . ." and "ii. [a]ny gaps in practice and decision-making information that were identified *during the second level review*."  (Id. (emphasis added by Court).)

The second part of Policy 3.18 sets out what the CICC Social Services Supervisor is expected to do, depending on whether the recommendation to screen-out (or, relatedly but alternatively, to "screen-out and refer") was (1) approved by the Administrator/Designee (section

---

[2]  According to Policy No. 3.0 of the Georgia Division of Family and Children Services Child Welfare Policy Manual, "CICC" is short for Child Protective Services Intake Communication Center.  (Doc. 64-4.)

1) or (2) rejected by the Administrator/Designee (section 2).  (Id. at p. 18.)  Section 1 provides that: "a. Upon receipt of the **second level approval** from the Administrator/Designee for **a screen-out and refer**, [the Social Services Supervisor is to] place the Intake Assessment on the County Department Supervisor's workload in Georgia SHINES for the County Department to make the referral," and "b. If the screen-out Intake Assessment involves an open case, notify the County Department **upon second level approval by the CICC administrator**."  (Id. (emphasis added by Court).)   On the other hand, where the Administrator/Designee has *rejected* the screen-out recommendation in the Intake Assessment, the Social Services Supervisor must, *inter alia*: "a. [d]ocument the reasons the Intake Assessment was not approved for screen-out . . . and refer and discuss with the Intake Case Manager any follow up that needs to be completed in order to complete the Intake Assessment process," and "b. [i]f there is sufficient information in the Intake Assessment, but the recommendation to screen-out . . . is not agreed with, **complete the Supervisor Justification section** in Georgia SHINES and document the specific maltreatment and present danger situation or impending danger safety threat (if applicable), ensuring that the corresponding sections in the Intake Assessment and Family Functioning Areas are updated to reflect the appropriate disposition and/or track assignment decision."  (Id. (emphasis added by Court).)

It is important to note several things about the text of Policy 3.18.  First, the Policy's text only calls for one individual (the "CICC Administrator/Designee") to perform a "review" of an Intake Case Manager's screen-out recommendation, and if this reviewer (the Administrator/Designee) approves of the screen-out, then they are to document their approval (explicitly referred to as "the second level approval") in a "Comments section" on the "approval authority page."  While the Policy also sets out requirements for a "Social Services Supervisor" to take certain actions, the only situation that requires the provision of *further* documentation or

justification (that is, by the Social Services Supervisor) is where the Administrator/Designee (during the second level review) *rejected* the screen-out recommendation in the Intake Assessment. (See id. at p. 18 ("2.    If [the screen-out or screen-out and refer was] rejected by the Administrator/Designee[, the Social Services Supervisor will]: . . . b. [i]f there is sufficient information in the Intake Assessment, *but the recommendation to screen-out/screen-out and refer is not agreed with*, complete the Supervisor Justification section in Georgia SHINES and document the specific maltreatment and present danger situation or impending danger safety threat (if applicable), ensuring that the corresponding sections in the Intake Assessment and Family Functioning Areas are updated to reflect the appropriate disposition and/or track assignment decision.") (emphasis added by Court).)

Plaintiff has focused her argument about noncompliance with Policy 3.18 on a boxed section of the Intake Report with the heading "Response Time." (See doc. 64-2, pp. 9–10.) She claims the way this section was filled out proves, beyond dispute, that Lawson and Windley failed to comply with the Policy. This "Response Time" section contains three text boxes, each containing some narrative text. (Id.) The titles/descriptions for the three boxes (listed next to each box) are, respectively: "Intake Case Manager Justification," "Supervisory Justification," and "Second Supervisory Justification." (Id.) The first box contains text stating that "ICM Lawson recommends this case for SCO" (along with additional text providing more information about the case and recommendation). (Id. at p. 9.) The latter two boxes both contain the following (identical) text: they both begin with the statement, "Windley agrees with screen out" and then both appear to contain identical information (about the case) thereafter.[3] (Id. at pp. 9–10.) Plaintiff

---

[3] The text in these boxes appears to be cut off in the printout (or screen shot) of the Intake Report, and it appears that, if the Report were being viewed on an electronic device, one could scroll down to see more text.

claims the three boxes in this portion of the Intake Report show that *two* supervisors were supposed to document their approval of Lawson's screen-out recommendation, yet only Windley gave her approval (since her approval and support was copied from the "Supervisory Justification" box and pasted into the "Second Supervisory Justification" box).

The Court, however, in its review of the Intake Report, has observed a page with the heading "Approval Status – Approve Intake Report," which contains a section for "Comments." (Doc. 64-2, p. 8.)  This page has two entries under the heading "Current Status".  (Id.)  The first entry lists "Status" as "Approved" as of "03/16/2017" at "09:03 PM," with the "Approver" listed as "White, Latonja."  (Id.)  The second entry lists the "Status" as "Approved" as of "03/17/2017" at "07:54 AM," with the "Approver" listed as "Windley, Catrice."  (Id.)  Immediately under this is the heading "Approval Information," which has a space for "Approver:" (which is blank), "Date:" (which states "03/17/2017"), and "Time:" (which states "07:54 AM") and then a section for "Comments:" which appears to have been left blank.  (Id.)  Although neither party relied on this page in their briefing, a reasonable juror could find it to be materially relevant to a determination of whether Policy 3.18 was breached.

Plaintiff does not provide any meaningful discussion of the specific text contained in Policy 3.18.  Instead, she cites her own witnesses—whom she claims are retained "experts" on DFCS procedures—who have given their own description of what they believe was required by Policy 3.18.  (Doc. 64, pp. 4, 6–8.)  In their affidavits, however, neither individual quotes any language from—much less discusses any of the express text of—the Policy itself.  (See doc. 64-8, pp. 1–3 (affidavit from an individual who "previously served as a Social Services Supervisor and Case Manager for Liberty and Long County Georgia [DFCS] between 2019 and 2023"); doc. 64-11, pp. 1–2 (affidavit from the former "Assistant Dean of Field Education at the University of North

Carolina at Chapel Hill, School of Social Work," who worked with the North Carolina Division of Social Services, but lists no experience with the Georgia DFCS).)  These individuals simply state, in conclusory fashion, that they read Policy 3.18 to require that, for a case to be properly "screened out," two "supervisors" must review and give approval of and justification for the screen out recommendation, meaning a justification must be given by a second supervisor (which they call "Second Supervisor justification").  They conclude that such was not done here, in violation of Policy Number 3.18.[4]  (See docs. 64-4 & 64-11.)

Defendants offer an affidavit from Defendant Windley, which states that she is "currently a Child Welfare Services Administrator with the Georgia [DFCS]," that she "ha[s] been employed by DFCS for twenty-three (23) years," and that, "[i]n March of 2017, [she] was employed by DFCS as a Social Services Supervisor."  (Doc. 72-1, p. 2.)  She testifies that she "was the Supervisor and final approver for the Screen Out of the [at-issue] Intake Report," that she agreed with the screen out recommendation by Intake Case Manager Lawson, and that she "had the authority, as final approver, to agree or disagree with Lawson's recommendation."  (Id. at p. 2.)

As a seminal rule of interpretation of language used in a document, a court must ascribe the plain meaning to the words used in the writing.  See Consol. Bank, N.A., Hialeah, Fla. v. United

---

[4] The Court notes that, although Plaintiff's brief and the affidavits of her purported experts repeatedly claim there was a "second supervisor" requirement, Policy 3.18 does not contain the phrase "second supervisor" and never references a requirement for approval by a "second supervisor," particularly where, as here, the screen-out recommendation is approved.  The only use of some version of the words "second" and "supervisor" together is the "Second Supervisory Justification" text box in the Intake Report.  While the Court makes no decision on the issue, the Court notes that this text box could be interpreted as the space to be filled in by a Social Services Supervisor where the Administrator/Designee has *rejected* the screen-out recommendation in the Intake Assessment.  (See doc. 64-8, p. 18 (where the Administrator/Designee has rejected the screen-out recommendation in the Intake Assessment, the Social Services Supervisor must, *inter alia*: "a. [d]ocument the reasons the Intake Assessment was not approved for screen-out . . . and refer and discuss with the Intake Case Manager any follow up that needs to be completed in order to complete the Intake Assessment process," and "b. [i]f there is sufficient information in the Intake Assessment, but the recommendation to screen-out . . . is not agreed with, *complete the Supervisor Justification section* in Georgia SHINES and document the specific maltreatment and present danger situation or impending danger safety threat (if applicable) . . . .") (emphasis added by Court).)

States Dept. of Treasury, 118 F.3d 1461, 1463 (11th Cir. 1997). "Thus, a court should look beyond the plain language only when that language is unclear or ambiguous, when the drafter of the language has expressed clearly an intent contrary to the plain language, or when absurd results would follow from implementing the plain language interpretation." United States v. Scrushy, CR.2:05CR119-MEF, 2007 WL 1296000, at *13 (M.D. Ala. May 1, 2007) (citing Alacare Home Health Servs., Inc. v. Sullivan, 891 F.2d 850, 856 (11th Cir. 1990)). As Plaintiff has not argued, much less shown, that there is some basis for the Policy to be interpreted beyond its plain language, for purposes of Plaintiff's Motion for Summary Judgment the Court considers only the text of the Policy and its plain meaning, not Plaintiff's retained witnesses' conclusory interpretations, for which they offer no textual support.

The evidence before the Court fails to establish as a matter of law that Lawson and Windley violated Policy 3.18 by not having a third individual (specifically, one in a supervisory role) review, approve, and document their approval of the screen-out recommendation. The Policy's text does not require a third individual to be involved unless the first reviewer—during the "second level review"—declines to give "second level approval" and instead rejects the screen-out recommendation in the Intake Assessment. Here, looking at the Intake Report as a whole—including both the page labeled "Approval Status—Approve Intake Report" and the page with the box entitled "Response Time"—a reasonable juror could find that Lawson made a screen-out recommendation during her Intake Assessment and then Windley performed a second level review of that recommendation, decided to approve the recommendation, and documented that second level approval on the Intake Form, all in compliance with Policy 3.18. Plaintiff has not pointed to any evidence that would make it unreasonable for a juror to reach this conclusion. To be sure, the Court is not saying this is the conclusion that is *required* by the evidence, but, in light of the

standards the Court must apply on Plaintiff's Motion for Partial Summary Judgment, the Court cannot conclude that it has been established beyond dispute that Lawson and Windley violated Policy 3.18. At this point, that issue must be determined by a trier of fact.

II.    **Whether Lawson and Windley Violated Policy 3.14 ("Sharing Intake Reports With Law Enforcement or District Attorney")**

Plaintiff contends that the record and Defendants' lack of refutation also establish that Lawson and Windley failed to comply with DFCS Policy 3.14's mandatory procedures for informing law enforcement of suspected child abuse. (Doc. 64, pp. 9–10.) The plain language of Policy 3.14 imposes two distinct requirements: to notify law enforcement that a report has been received through the SHINES Intake Action page (the "Notification Requirement") and then to share the intake report with law enforcement via mail or secure email (the "Report-Transmission Requirement"). (Doc. 64-9, p. 1.) The parties largely conflate these two requirements, focusing on whether law enforcement was generally "notified" rather than whether the procedures mandated by DFCS Policy 3.14 were followed. (See doc. 64, pp. 9–11; doc. 72, p. 3; doc. 76, p. 3.) Further, by its terms, Policy 3.14 imposes these obligations only on the "Case Manager"—based on the evidence currently presented to the Court, here, that appears to be only Lawson. (See doc. 64-3, p. 6.) It is unclear from the filings and the record whether Windley was similarly obligated to follow the procedural requirements of Policy 3.14.

As the party both moving for summary judgment and bearing the burden of proving Lawson and Windley's noncompliance with DFCS policies, Plaintiff must support her Motion with credible evidence that would entitle her to a directed verdict at trial, showing that no reasonable jury could find for Defendants. Four Parcels, 941 F.2d at 1438. It is only after Plaintiff makes this affirmative showing that Defendants must provide evidence establishing the existence of a triable issue of fact to survive summary judgment. Id. Here, the Court must consider whether

13

Plaintiff has met her burden as to each requirement of Policy 3.14 and as to each relevant Defendant.

In support of her argument, Plaintiff relies on a variety of evidence in the record. (Doc. 64, pp. 9–10.) First, Plaintiff characterizes Roberts' testimony on behalf of DFCS as stating that "if law enforcement was notified, there would be either a fax or email confirmation of the report being transmitted." (Id. at p. 10 (citing doc. 64-13, p. 21).) This is a subtle misstatement of Roberts' testimony, however. Roberts did not state that the transmission of the report would typically be *confirmed* by a fax or email, only that the report would typically be *sent* via email or fax. (Doc. 64-13, p. 21.) There is nothing in Roberts' testimony indicating that the DFCS records would typically include emails or faxes confirming the transmission of the intake reports. Nonetheless, Plaintiff emphasizes that, when asked if any such confirmation existed here, Roberts testified that he could not locate any. (Id.) Next, Plaintiff points to Mock's letter stating that DFCS "do[es] not have a copy of a fax or email, though DFCS records indicate law enforcement was notified in March 2017." (Id. (quoting doc. 64-7, p. 10.) Additionally, Plaintiff offers the email from ECSO's counsel stating that ECSO does not have a record of having received a report regarding Jr.'s abuse in March 2017. (Id. (citing doc. 64-14, p. 1).) Finally, Plaintiff emphasizes testimony given by Lawson (the intake case manager) that sending a copy of the report to law enforcement was not one of her duties. (Id. at p. 11 (quoting doc. 64-3, p. 6).)

Beginning with the Notification Requirement, Plaintiff has failed to carry her burden on this point. Plaintiff claims there is a lack of affirmative proof that law enforcement was notified, (doc. 64, pp. 9–11), but the only element of "proof" mandated by Policy 3.14 is the requirement to "Document on the Georgia SHINES Intake Action page that law enforcement was notified of the intake report," (doc. 64-9, p. 1). The Policy does not appear to mandate that some additional

documentary proof be created or retained.  (See id.)  It is undisputed that the Intake Report indicates law enforcement (specifically, ECSO) was notified.  (Doc 64-1, p. 3.) Further, Mock's letter affirmatively states that DFCS records indicate that law enforcement was "notified" in March 2017.  (Doc. 64-7, p. 10.)

Defendants argue that Plaintiff's Motion makes an "unfounded leap" from the lack of any email or fax confirming that law enforcement was notified to the conclusion that, therefore, the undisputed evidence proves that law enforcement was indeed not notified.  (Doc. 72, p. 3.)  The Court agrees.  The lack of external confirmation that law enforcement was notified may support the conclusion that the Notification Requirement was not followed, but it does not require it.  A reasonable jury weighing the evidence and making credibility determinations could conclude that the Notification Requirement was followed based off the face of the Intake Report and the statements of Mock and Roberts.  Moreover, as she bears the burden of proof at trial, Plaintiff cannot rely on Defendants' inability to produce evidence and must instead affirmatively show the absence of a genuine issue of material fact as to the Notification Requirement.  See Landolfi v. City of Melbourne, Fla., 515 F. App'x 832, 834 (11th Cir. 2013) (internal citation omitted).  Plaintiff has failed to do so with respect to the Notification Requirement.

As for the Report-Transmission Requirement, the analysis differs as to each defendant. Beginning with Lawson, the record warrants granting Plaintiff summary judgment as to her.  It is undisputed that Lawson was a "case manager" during her time at the DFCS, with Lawson herself testifying that she would have been the intake case manager referred to in Policy 3.14.  (Doc. 64-3, p. 6.)  During her deposition, Lawson repeatedly testified that she did not send the Intake Report to law enforcement, maintaining that transmitting intake reports to law enforcement "wasn't [her] job" but was instead the responsibility of her supervisor.  (Id. at pp. 6–7, 11.)  Lawson's repeated

admissions, along with the lack of any rebuttal evidence to suggest that she sent the Report, establish that there is no factual dispute as to Lawson's failure to comply with the Report-Transmission Requirement. Plaintiff's Motion for Summary Judgment is thus granted as to Lawson's failure to send the Intake Report to law enforcement.

With Windley, however, the record is far less clear on whether she was even subject to the mandates of Policy 3.14. By its plain language, the Policy imposes procedural obligations on the "CPS Intake Communications Center Social Services Case Manager." (Doc. 64-9, p. 1.) At the time the Intake Report was received, Windley was a "Social Services Supervisor," (doc. 72-1, p. 2; see also doc. 1-1, p. 2 ("Windley was a Supervisor")), which—based on the evidence before the Court—appears to be separate and distinct from the role of "Intake Communications Center Social Services Case Manager," (see doc. 64-3, p. 6 (Lawson's testimony that she was "the CPS Intake Communications Center Social Services Case Manager" at the time)). Nothing in the record indicates that Policy 3.14 placed duties on Windley, and Plaintiff has not identified any other policy or statute which imposed a duty on Windley to transmit the Intake Report to law enforcement.[5] As Plaintiff is seeking summary judgment on Windley's supposed violations of her ministerial duties, (doc. 64, pp. 3–4), she must show that Windley was subject to a specific duty as established by a policy, statute, or directive. Roper, 751 S.E.2d at 353; see also Kennedy v. Mathis, 676 S.E.2d 746, 748 (Ga. Ct. App. 2009) (internal citations omitted) (whether an act is ministerial depends on the specific actions complained of and not the "general nature of the job").

---

[5] In both her Complaint and her Motion for Summary Judgment, Plaintiff notes that DFCS personnel such as Windley are required to report suspected child abuse to law enforcement pursuant to O.C.G.A. § 19-7-5(c)(1). (Doc. 1-1, pp. 18–19; doc. 64, p. 10 n.2.) O.C.G.A. § 19-7-5(c)(1) requires DFCS personnel to report suspected child abuse to law enforcement, but it does not specifically require that the intake report received by DFCS be transmitted to law enforcement. As explained by the Court's discussion of the Notification Requirement of Policy 3.14, whether the suspected abuse of Jr. was properly reported to law enforcement remains a question of fact.

Plaintiff has not done so here, and the Court thus denies her Motion with respect to Windley's alleged failure to comply with the Report-Transmission Requirement.

## CONCLUSION

For these reasons, the Court **GRANTS in part and DENIES in part** Plaintiff's Motion for Partial Summary Judgment. (Doc. 64.)  The Court **DENIES** the Motion on the issue of whether Lawson or Windley violated Georgia DFCS Policy 3.18.  The Court **DENIES** the Motion as to the issue of whether Lawson or Windley violated Policy 3.14's Notification Requirement.  The Court **GRANTS** Plaintiff's Motion as to Policy 3.14's Report-Transmission Requirement with respect to Lawson and **DENIES** Plaintiff's Motion with respect to Windley on that issue.

**SO ORDERED**, this 26th day of March, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA